1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| JENNIFER TERAN, | 1:09cv02258 DLB |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

9
10
11
12
13
14
15
16

## BACKGROUND

17

Plaintiff Jennifer Teran ("Plaintiff") seeks judicial review of a final decision of the

18

Commissioner of Social Security ("Commissioner") denying her application for disability

19

insurance benefits ("DIB") pursuant to Title II of the Social Security Act.  The matter is currently

20

before the Court on the parties' briefs, which were submitted, without oral argument, to the

21

Honorable Dennis L. Beck, United States Magistrate Judge.

22

## FACTS AND PRIOR PROCEEDINGS[1]

23

On December 28, 2006, Plaintiff filed an application for DIB.  AR 122-24.  She alleged

24

disability since April 28, 2005, due to degenerative disc disease and bad left ankle.  AR 138-46.

25

After being denied initially and on reconsideration, Plaintiff requested a hearing before an

26

Administrative Law Judge ("ALJ").  AR 87-91, 93-97, 98.  On January 21, 2009, ALJ Michael J.

27
28

---

[1] References to the Administrative Record will be designated "AR," followed by the relevant page number.

Kopicki held a hearing.  ALJ Kopicki denied benefits on May 13, 2009.  AR 70-82.  The Appeals

Council denied Plaintiff's request for review on August 8, 2009.  AR 7-9.

On August 25, 2009, Plaintiff requested that the Appeals Council reopen the decision.

AR 5.  The Appeals Council denied Plaintiff's reopening request on November 25, 2009.  AR 1-

2.

Hearing Testimony

ALJ Kopicki held a hearing on January 21, 2009, in Fresno, California.  AR 28.  Plaintiff

appeared with her attorney.  Vocational expert Thomas Dachelet also appeared.  AR 15, 28.

Plaintiff lives with her husband and with her three children, ages 3, 9, and 11.

Plaintiff was born in 1979.  She has a twelfth grade education, but does not have any vocational

training or military service.  She is 5'1" and weighs about 200 pounds.  Her normal weight is

about 160 to 180, but she gained weight "just not being as active."  She is left handed.  AR 30-

31.

Plaintiff's alleged onset date is April 28, 2005, and she has not worked since that date.

Prior to that, she worked in collections for nearly three years.  The job entailed using a telephone

and computer at a call center.  She did some data entry.  She had a quota, which was an 80%

recovery rate.  When calling someone, she had to notify them who she was, why she was calling

and for what bill.  She had to be firm without being impolite.  AR 31-32.

Before that job, she worked at a health insurance company in a customer call center.  She

took calls from people seeking pharmacy overrides.  She would take their information and either

submit it to a "higher up" or call the pharmacy.  AR 33-34.

Before that, she worked for a short period at Mr. Rooter Plumbing.  She answered the

phone, taking service calls and dispatching plumbers.  Prior to that, she worked in fast food

service.  AR 34.

Plaintiff felt that pain kept her from working.  In April 2005, she was pregnant and started

experiencing back pain.  Her OB/GYN took her off work because she had severe hyperemesis,

which may have been from fibromyalgia.  Plaintiff explained that the pain is mainly in her right

lower back.  She described it as constant aching, sometimes sharp or stabbing.  The pain travels

2

to her neck, her shoulders and sometimes to her right knee, hands, arms and legs.  She also has

neck pain and recently had a nerve conduction study to confirm a pinched nerve.  She has no

other pain.  AR 34-36.

Plaintiff testified that she takes 750 mg of Vicodin four times a day.  It helps relieve some

of the pain, but she cannot "totally clearly" function on the Vicodin.  It causes side effects of

fatigue and sometimes nausea.  She tries to time the medication around driving her children to

and from school.  AR 36-37.

Plaintiff also testified that she takes 350 mg of Soma twice a day.  It helps her relax, but

causes dizziness, sometimes drowsiness or an altered mental state.  She takes medication for high

blood pressure, too.  She didn't think her high blood pressure was controlled.  AR 37-38.

She also takes Wellbutrin four times daily for depression/pain.  It makes her whole

overall well-being better.  When she stopped taking it for a period of time, she felt depressed.

When she is taking it, she feels a little bit better. She is not undergoing any counseling or

therapy.  In the past, she had therapy for about six months through a pain program.  When the

program ended, she stopped seeing the doctor.  She didn't feel it was helping her "a whole lot."

AR 38-39.

Plaintiff testified that she has tried physical therapy, a TENS unit, and heating pads, but

the only thing that temporarily relieved her pain was warm pool therapy.  Her doctor

discontinued the therapy, but she didn't know why.  He told her that she could continue on her

own.  At one point, she joined the gym to do pool therapy, but it was too hard to do on her own.

She worked out at the gym, but stopped because it was too painful.  It helped "a little bit" with

weight loss.  AR 39-41.

Plaintiff testified that pretty much everything makes the pain worse, including sitting,

standing, walking, bending, lifting and reaching.  Sometimes she has to lie down to alleviate the

pain and sometimes she has to get up to alleviate it.  AR 41.

Plaintiff explained that she broke her ankles in May 2006.  She got tangled in a diaper

bag, tripped and fell out of her minivan.  She had surgery on her left ankle, which she broke in

1    three places.  She occasionally gets pain in both ankles.  She does not have any difficulty

2    walking, but has arthritis type pain in her left ankle when it is cold.  AR 41-42.

3        Plaintiff confirmed that she has a diagnosis of fibromyalgia and has been seeing a

4    rheumatologist.  She takes medication for fibromyalgia.  AR 43-44.

5        In a typical day she gets up, supervises her older children getting ready for school, drops

6    them off at school, comes back home, takes her medication, makes her three-year-old something

7    to eat, sits and reads with him and watches TV.  She picks her children up at three, comes back

8    home, takes her medication and waits for her husband to get home to help her.  She can attend to

9    her personal needs, but does very little housework and prepares only simple meals.  She does not

10   bathe her three-year-old because she cannot lift him out of the tub.  She does not do laundry.  She

11   can put clothes in the washer, but cannot carry the laundry baskets.  Her children or husband

12   help.  She goes grocery shopping with her husband, but does not do dishes, vacuuming, yard

13   work or gardening.  She feeds her fish and watches TV about four hours a day.  She has a

14   personal computer for paying bills and can work on a keyboard for a few minutes.  She is not a

15   member of any clubs or organizations, does not attend religious services and socializes very little.

16   She doesn't go to the movies or to the water park.  She has a mother and sister in the area, but

17   doesn't see them very often.  AR 44-48.

18       In response to questions from her attorney, Plaintiff testified that she could stand or walk

19   up to five minutes and then her back starts hurting.  She can sit about five minutes without pain.

20   She testified that she had pain at the hearing and was very uncomfortable.  When it was pointed

21   out that she had been sitting for longer than five minutes, Plaintiff said she had been moving

22   around in the chair, but didn't think she could sit much longer and needed to stand.  AR 48-50.

23       Plaintiff reported that she could lift a gallon of milk, but not without pain in her right

24   lower back.  It would hurt her right hand if she lifted more than milk.  She uses two hands to lift

25   the milk.  AR 50-51.

26       Plaintiff testified that she began seeing Dr. Watrous in January 2007.  Although she

27   stopped working at her old job when she was pregnant, the pain persisted after her last

28   pregnancy. In 2006, she had lidocaine injections in her right shoulder for pain.  She still has

4

1  problems with both of her shoulders, including pain and muscle spasm.  She stopped the

2  injections because they didn't help.  She now treats her shoulders with Soma or heat.  AR 51-52.

3      Plaintiff clarified that she watches TV for about 4 hours total in a day, not 4 hours

4  straight.  She takes breaks between watching shows and anything that she does.  She has

5  difficulty doing chores, such as dusting.  Her husband helps her cook because she can't stir very

6  much, she can't lift the pots and pans and she can't stand long enough.  AR 53.

7      Plaintiff testified that she has migraines, but they are under control with medication.  She

8  also has chronic pain syndrome and sleeping problems.  It takes her "quite awhile to fall asleep"

9  and she wakes up several times from pain.  She rests during the day and sometimes naps.  AR 53-

10 54.

11     Plaintiff further testified that she had her gallbladder removed and has one kidney.  The

12 kidney is congenital and she sometimes gets urinary tract infections.  She also gets nausea and

13 vomiting, but the cause is unknown.  She has a "very sensitive stomach."  AR 55-56.

14     The Vocational Expert ("VE") also testified.  He reported that Plaintiff's past work as a

15 collector is sedentary, skilled.  Her work in customer service with health insurance is light, SVP

16 4, semi-skilled.  The VE indicated that the fast food restaurant could be one of three possibilities.

17 AR 56-57.

18     The ALJ asked Plaintiff clarifying questions regarding her fast food work.  Plaintiff

19 worked at McDonald's in 1997 and 1998, and eventually was a shift manager.  She worked forty

20 hours a week as a shift manager.  Before that, she worked around 30 hours a week.  As a shift

21 manager, she did not hire or fire people.  She kept track of inventory, supervised shifts and

22 trained people.  In 2001, she was no longer doing fast food, but worked in check cashing.  AR

23 58-60.

24     The VE clarified that Plaintiff's general fast food work is light, unskilled.  The VE

25 equated the shift manager work with a clerk, general, which is light, 4, and semi-skilled.  AR 61.

26     Plaintiff further testified about her work in check cashing.  She would check a customer's

27 references, examine checks and cash them.  The store also did payday loans..  AR 61-62.

28

1    The VE testified that Plaintiff's work with the plumbing company as a general clerk is

2    light, SVP 4, semi-skilled work.  He again reported that her health insurance work is customer

3    service, light, SVP 4.  The collections job is sedentary, SVP 5, skilled.  AR 62.

4    The ALJ also asked the VE a series of hypothetical questions.  For each hypothetical, the

5    ALJ asked the VE to assume an individual between 26 to 29 years old, with a high school

6    education and Plaintiff's work history.  For the first hypothetical, the ALJ also asked the VE to

7    assume an individual who could lift and/or carry 20 pounds occasionally, 10 pounds frequently,

8    could stand and/or walk two hours out of an eight-hour workday, could sit six hours out of an

9    eight-hour workday, and occasionally could climb and stoop.  The VE testified that such an

10   individual could perform Plaintiff's past relevant work with the collection agency.  AR 63.

11   For the next hypothetical, the ALJ asked the VE to assume the same individual who,

12   because of depression and medication side effects, was limited to simple, routine tasks.  The VE

13   testified that this person could not perform the sedentary, skilled position at the collection agency

14   or any other past relevant work.  However, this person could perform other jobs in the national

15   economy and the "whole world" of sedentary, unskilled work would be available.  AR 63-64.

16   For the third hypothetical, the ALJ asked the VE to assume an individual who could lift

17   ten to fifteen pounds occasionally, five pounds frequently, could sit less than one hour and could

18   stand/walk twenty to thirty minutes.  Out of an eight-hour day, this person also could reach five

19   percent of the time, handle ten percent of the time, feel thirty percent of the time, push/pull less

20   than five percent of the time and grasp five percent of the time.  At one time, this person could

21   reach one to two minutes, handle two to three minutes, feel ten minutes, push/pull two to three

22   minutes and grasp two to three minutes.  The VE testified that this person could not do any past

23   relevant work or any other work.  AR 64-65.

24   For the fourth hypothetical, the ALJ asked the VE to assume an individual who could lift

25   about eight pounds, could walk for five minutes, could stand for five minutes, could sit a

26   maximum of thirty minutes with discomfort and would need thirty minutes rest between shifting

27   position.  The VE testified that work would be eliminated.  AR 65.

28

Plaintiff also testified in response to additional questions from the ALJ. She reported that she was referred to a pain management clinic. She still goes for management of her pain medication. She did not remember why she said in September 2006 that she opted not to participate because she needed to take care of her children. She did participate at a later time. Plaintiff also clarified that she left the collections job because she was pregnant, she started having increasing back pain and had severe hyperemesis. She ended up having her gallbladder out and she was very sick. She was not having any issues with the supervision and they let her start working part time. AR 66.

The ALJ noted that Greg Hirokawa, the consultative evaluator, wrote that she reported being fired for insubordination. Plaintiff confirmed that she was fired in 1996 for insubordination at Carl's Junior. She had disciplinary actions at the collections jobs for absences. She said it was possible that they were confused when the history was taken because she was confused. She affirmed that she never got fired from the collections job, clarifying that she was let go because her medical time ran out, not for insubordination. AR 67-68.

Medical Record

On November 15, 2005, Plaintiff complained of worsening migraines since delivering her baby three weeks earlier. She was prescribed medications. AR 243-44.

On December 16, 2005, Plaintiff saw Dr. William Holvik for follow-up of her migraines. She reported 5-6 headaches per month with 2 severe spells. She was prescribed medication, including skelaxin and Norco. AR 239-40.

On January 10, 2006, Plaintiff sought treatment from Dr. Holvik after an emergency room visit. Plaintiff had pain in her lower back that became increasingly severe. On examination, she had adequate range of motion, stable gait, and normal muscle strength and tone. She had no joint tenderness or effusion. Her back was tender to pressure along L1-L4 and she had mild tenderness along the right CVA region. Dr. Holvik assessed low back pain and made a referral for physical therapy. He also reviewed lifestyle changes, including weight loss needs. AR 237-38.

Magnetic Resonance Imaging ("MRI") of the lumbar spine completed in January 2006 showed mild degenerative disc disease at L4-5 and moderate degenerative disc disease at L5-S1. AR 204. A subsequent MRI in March 2006 revealed slightly left-sided central disc protrusion at L4/5 with suspected impingement on the left neural foraminal recess and associated left-sided L5 and S1 roots. AR 205.

Plaintiff attended physical therapy on January 18 and 20, 2006. AR 367-68.

On February 2, 2006, Plaintiff sought follow up for her low back pain. She reported that the pain became increasingly severe with physical therapy and traveled along her posterior thigh. Her legs felt weak and she was concerned about taking too much pain medication. Dr. Holvik diagnosed chronic low back pain secondary to degenerative disc disease. AR 233-34.

On February 23, 2006, Plaintiff reported that her low back pain had worsened since her pregnancy. She also reported weakness in both legs and one arm. She needed her disability paperwork filled out, stating that there was no way she would be able to work with her back. On examination, she had limited range of motion, but her muscle strength and tone were normal. She had no joint tenderness or effusion. The nurse practitioner provided a trial of Soma and a Lidoderm patch, along with a prescription for Robaxin. Additionally, the nurse noted that she would fill out disability paperwork. AR 231-32.

On March 1, 2006, Plaintiff sought treatment for back pain. On examination, she had adequate range of motion, stable gait, normal strength and tone, and no joint tenderness or effusion. Her low back was tender to pressure. She was prescribed Neurontin and ibuprofen and her Norco was refilled. She was noted to have hypertension/obesity and was advised to continue exercise as possible. AR 229-30.

On March 17, 2006, Plaintiff reported pain in her neck and shoulder blade. Following examination, Dr. Holvik diagnosed cervical myofascial pain syndrome and prescribed prednisone and Soma. She was given trigger point injections. Dr. Holvik opined that Plaintiff had a dependent personality disorder, which he believed was "a big component of her problems." AR 227-28.

On March 23, 2006, Plaintiff saw Dr. Holvik for her disability forms.  She reported that her neck pain had significantly diminished, but she had ongoing lower back pain.  The pain was localized to the lumbosacral region with minimal radiation into the legs.  Following examination, Dr. Holvik opined that Plaintiff had chronic low back pain with perhaps mild disk disease.  He believed a large component was due to her overweight status and her poor overall health-obesity.  He allowed disability for three months and refilled her Norco prescription.  AR 225-26.

On April 12, 2006, Plaintiff sought treatment for a possible panic attack.  She felt anxious, overwhelmed and irritable.  A nurse practitioner diagnosed anxiety and prescribed Xanax.  AR 223-24.

On April 27, 2006, Plaintiff saw Dr. Holvik for her back.  She reported that her legs felt weak, but she was walking once weekly and was "active at home with 3 kids."  She reported taking 8 Norco per day.  She also admitted feeling overwhelmed and anxious, taking Xanax several times since her last visit.  On examination, she had adequate range of motion, stable gait and normal muscle strength and tone.  Her mood, memory and perception were normal.  Dr. Holvik prescribed Ultram and Norco for low back pain and Zoloft for depression.  AR 221-22.

On May 17, 2006, Dr. Bruce Le operated on Plaintiff's left ankle.  Plaintiff had fallen out of her car and sustained a left trimalleolar fracture and a right talus fracture.  AR 273-74.

On May 24, 2006, Plaintiff reported that Norco was not covering her ankle pain.  She was to be evaluated for pain management in July for her chronic low back pain.  Her migraine headaches had diminished significantly.  On examination, her right foot was in a short leg cast and her left leg was in a dressing.  Her mood, memory and perception were normal.  Dr. Holvik prescribed a Duragesic patch and dilaudid.  AR 219-20.

On June 8, 2006, Plaintiff saw Dr. Holvik for her ankles.  She was noted to be taking Norco for pain and using a Duragesic patch.  Plaintiff reported having some anxiety spells and taking diazepam once or twice, but a higher dose of Zoloft was helping with depression.  On examination, Plaintiff had adequate range of motion and her muscle tone and strength were normal.  She had short leg casts on both lower extremities.  Her mood, memory and perception were normal.  Dr. Holvik increased her Zoloft.  AR 217-18.

1   On June 19, 2006, Plaintiff's ankles were examined.  She was given a Rocket brace for

2   the right ankle and a Cam walker for the left.  AR 269.

3   On June 23, 2006, Plaintiff saw Dr. Holvik for her pain condition and bilateral ankle

4   fractures.  She was taking 8-10 Norco per day, but her anxiety was better with the higher Zoloft

5   dose.  On examination, her muscle strength and tone were normal.  Her mood, memory and

6   perception were within normal limits.  She was advised to increase her duragesic patch, but

7   should average at most 8 Norco per day.  AR 215-16.

8   On July 5, 2006, David R. Cooper, M.D., completed a pain evaluation.  Plaintiff

9   identified ankle and back pain.  She also noted occasional right shoulder discomfort, depression,

10  difficulty relaxing and difficulty sleeping.  Dr. Cooper reviewed a March 2006 MRI report and

11  opined that there was "not much to be concerned about."  AR 291-92.  On examination,

12  Plaintiff's right shoulder range of motion appeared slightly decreased with some minimal

13  tenderness to palpation.  Her lower extremity hip flexion, knee extension and straight leg raise

14  were all reasonably good.  Dr. Cooper recommended decreasing Norco, substituting Methadone

15  and a chronic pain management program.  AR 292-95.

16  On July 20, 2006, Plaintiff saw Dr. Holvik for chronic back pain.  It was noted that she

17  was still healing from a left trimalleolar fracture, non weightbearing.  On examination, Plaintiff

18  had adequate range of motion, stable gait and normal strength and tone.  She was oriented and

19  her mood, memory and perception were normal.  She was to reduce her Duragesic patch and

20  follow-up with Dr. Cooper.  Disability forms were filled out.  AR 211-12.

21  On August 3, 2006, x-rays showed that Plaintiff's ankles had healed well.  Dr. Le opined

22  that Plaintiff was doing great and she should start weightbearing as tolerated.  She needed to get

23  up and move around to put some stress on the fracture.  AR 268.

24  On September 5, 2006, Plaintiff saw Dr. Cooper and reported that her back pain was

25  about 3 out of 10 and increased to 6 out of 10 when sitting or standing too long.  Dr. Cooper

26  continued her disability for 6 months.  AR 288.

27  On September 11, 2006, Gareth Houghton, Ph.D., completed a psychological evaluation.

28  On mental status exam, Plaintiff was oriented to person, place and time.  Her mood was

dysphoric and her affect was highlighted by tearing.  Her judgment was intact, while insight into her condition and the psychological aspects of it were considered more limited.  Plaintiff felt depressed and agitated.  Her thinking and concentration were acceptable, but she complained about forgetting small things.  She stated that her energy was alright, but she was "totally fatigued" by the end of the day.  She had a panic attack in April or March, but none since that time.  AR 262-63.

Dr. Houghton diagnosed Plaintiff with dysthymia and pain disorder affected by both psychological factors and general medical condition.  He assigned her a Global Assessment of Functioning ("GAF") of 60.  He also opined that she appeared to have been mildly depressed most of her life.  She seemed to operate at a lower level of efficiency, which was best described as dysthymic disorder.  Dr. Gareth indicated that Plaintiff's pain condition involved low back and ankles, but she rated her ankles as much more problematic than her low back.  AR 263-64.

On September 14, 2006, Plaintiff completed the MMPI-2.  Dr. Houghton indicated that the score configurations showed an individual who may have a tendency to resort to denial mechanisms or be slightly more conforming than the average person, who experiences a lot of physical symptoms, problems and complaints and who may be excessively concerned about the symptoms.  Dr. Houghton opined that such individuals tend to be generally negative and pessimistic.  She was depressed, was likely to be suggestible and might lack insight into her behavior.  She also might deny psychological problems, but under stress, physical symptoms tended to become exacerbated.  She tended to look for concrete, simplistic solutions that did not require self examination.  Low energy levels were part of her experience and could reflect fatigue or actual depression.  Dr. Houghton opined that the psychological test results were consistent with the diagnosis of dysthymia and pain disorder.  AR 259-60.

On September 14, 2006, Dr. Houghton wrote to Dr. Cooper about the pain management program.  Plaintiff reportedly told Dr. Houghton that it would not be possible to participate because she had no one to take care of her three children.  AR 258.

Plaintiff participated in physical therapy periodically between September 2006 and February 2007.  AR 399-407, 412.

On October 3, 2006, Plaintiff saw Dr. Cooper and said she still felt depressed.  She was taking Wellbutrin and needed to increase the dose.  She reported taking Methadone, up to 6 a day, and did not feel like it was helping her.  She also needed medication for migraines.  Dr. Cooper noted that she was involved in the pain management program.  He increased her Wellbutrin, decreased her Methadone and prescribed Axert for headaches as needed.  AR 285.

On October 5, 2006, Plaintiff saw Dr. Le for a recheck of her ankles.  She reported that the left hurt more and she had some stiffness.  On examination, she had mild swelling of the left ankle joint and mild tenderness.  She had pain at the extreme of motion.  X-rays showed that the ankles appeared to have healed.  Dr. Le opined that Plaintiff would always have some discomfort as a result of the injury, which was not uncommon.  Plaintiff reportedly would exercise on her own.  AR 267.

On October 31, 2006, Plaintiff reported that she could not participate in the pain program because her husband was on probation.  Dr. Cooper refilled her Vicodin, noting that she needed a narcotic agreement and tox-screen.  AR 282.

On December 20, 2006, Plaintiff saw Dr. Cooper and continued to complain of lower back and ankle pain.  She also reported being anxious at night with limited activities of daily living.  On examination, she could not walk on heels or toes.  Dr. Cooper prescribed Buproprion and gave her an exercise program for the left ankle.  AR 279.

On January 25, 2007, Plaintiff reported difficulty flexing her right knee.  On examination, there was no redness, swelling or tenderness and her gait was normal.  Dr. Cooper opined that Plaintiff had right knee pain of unknown etiology.  He doubted it was serious.  AR 278.

On February 3, 2007, Dr. G. W. Bugg, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  Dr. Bugg opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk at least 2 hours in an 8-hour workday and sit about 6 hours in an 8-hour workday.  She could push and/or pull without limitation.  She occasionally could climb and frequently could balance, stoop, kneel, crouch and crawl.  She had no manipulative, visual or environmental limitations.  AR 296-302.

On March 10, 2007, Greg Hirokawa, Ph.D., completed a comprehensive psychiatric evaluation. Plaintiff drove to the examination and ambulated without assistance. She reported feeling depressed, anxious, having mood swings and worrying a lot. She was currently receiving mental health treatment and indicated it was somewhat helpful. In recounting her employment history, she noted working at fast food, customer service and being a collector. The longest job she held was as a collector and she reported being fired for insubordination. She had problems at work with being absent, but she got along okay with coworkers. AR 304-05.

On mental status exam, Plaintiff's mood appeared depressed, but her affect was appropriate as to content. She was oriented, her intellectual functioning appeared to be within the average range and her memory appeared intact. Her calculation processing speed was within normal limits and she was able perform a simple three-step command. She was not able to spell the word "world" backwards. AR 305-06.

As to her activities of daily living, Plaintiff reported cooking, vacuuming, laundry, sweeping and mopping. Her typical day included taking her two children to school, taking care of her 1-year-old, doing some light housework, picking up her children, cooking, cleaning and getting the kids ready for bed. At times, she needed help from others doing housework and driving. She reported that she enjoys playing with and reading to her children. AR 307.

Dr. Hirokawa diagnosed adjustment disorder with mixed emotional features. He assigned Plaintiff a GAF of 63 and opined that her abilities were mildly limited. AR 307-08.

On March 27, 2007, Allen Middleton, Ph.D., completed a Psychiatric Review Technique form. Dr. Middleton opined that Plaintiff was dysthymic, which did not precisely satisfy the diagnostic criteria for an affective disorder. She also had a pain disorder, which did not precisely satisfy the criteria of a somatoform disorder. Although she had no restriction in her activities of daily living, she had moderate difficulties maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. There was insufficient evidence of repeated episodes of decompensation. AR 309-319.

On the same date, Dr. Middleton completed a Mental Residual Functional Capacity Assessment form. He opined that Plaintiff was not significantly limited in understanding,

memory, sustained concentration, persistence, or adaption.  Generally, she was not significantly limited in social interaction, but was moderately limited in her ability to interact appropriately with the general public.  AR 320-22.

On March 1, 2007, while in the pain management program, Plaintiff reported that she was mentally improving, but her pain had not decreased.  She rated her low back pain as 5 out of 10 and her ankle as 4 out of 10.  She was in physical therapy, but continued to use Norco.  Dr. Cooper assessed her with continued low back and ankle pain with debilitation and depression. He recommended that she finish the pain management program.  AR 331.

On March 15, 2007, Plaintiff reported to Dr. Cooper that she still had difficulty with pacing and relaxation and her back pain persisted.  AR 330.

On April 4, 2007, Plaintiff complained about low back pain and rated her pain at 8 out of 10.  She had one or two more sessions in the cognitive behavioral functional restoration program and was doing lumbosacral stabilization exercises.  Dr. Cooper noted that next time they would try weaning some of her medication.  AR 326.

On April 30, 2007, Plaintiff saw Dr. Houghton after completion of the pain management program.  Plaintiff presented with a little brighter, more positive attitude.  AR 370.

On May 8, 2007, Plaintiff saw Dr. Cooper and rated her pain at 4 out of 10.  She was to cut back on Vicodin.  AR 325.

On June 25, 2007, Plaintiff saw Dr. Houghton and reported that she was working out at the gym up to 5 days a week.  She had lost 17 pounds and had a goal of losing another 35. Although she rated her pain at 7/10, she felt so positive about feeling better generally and losing weight that she tolerated the increased levels of discomfort.  AR 369.

On June 26, 2007, Plaintiff again saw Dr. Cooper.  She rated her pain at 5/10 and reported that she was exercising 5 days a week.  He provided behavioral/educational suggestions, including exercise and pacing.  AR 432.

On August 28, 2007, Raman Varma, M.D., reviewed a nerve conduction study of Plaintiff's lower extremities.  Dr. Verma opined that they "were not much abnormal."  AR 378.

1    On October 2, 2007, Plaintiff told Dr. Cooper that she thought she had fibromyalgia

2    "based on review of internet."  Dr. Cooper provided her with a trial of Lyrica and discussed

3    behavioral techniques for chronic pain, including warm water aquatics, pacing and

4    biofeedback/stress management.  AR 427.

5    On November 5, 2007, Plaintiff told Dr. Cooper that she had taken herself off of

6    Buproprion, Halcion and Diazepam.  She said Lyrica did not help and made her sleepy.  AR 426.

7    On January 14, 2008, Daniel Watrous, M.D., completed a rheumatological evaluation.

8    Plaintiff reported that she had diffuse body pains associated with degenerative disk disease and

9    fibromyalgia.  She also reported that the pain was exacerbated by prolonged sitting, standing,

10   walking, or lifting.  On examination, her peripheral joints revealed no significant tenderness to

11   palpation or stress testing.  She had tenderness in the fibromyalgia tender points mildly to

12   moderately and tenderness in the paralumbar muscles.  Dr. Watrous assessed fibromyalgia with

13   chronic low back pain and degenerative disk disease.  He discussed options with Plaintiff,

14   including a trial of sleeping medicines with Ambien and trazodone to try to improve overall

15   function.  He also discussed "conservative management of fibromyalgia as well as low back

16   pain."  AR 446-48.

17   On February 20, 2008, Plaintiff reported to Dr. Watrous that she was sleeping better with

18   the Ambien and Soma, which was giving her more energy and some improved performance.

19   Examination revealed no significant erythema, increased warmth or effusion.  Dr. Watrous told

20   her it was too early to determine whether he supported disability since he just started treating her.

21   AR 445.

22   On April 1, 2008, Dr. Watrous noted that Plaintiff had mild tenderness diffusely, but

23   moderate tenderness in the paralumbar muscles.  He agreed to an MRI update and prescribed

24   Ativan.  AR 444.

25   A MRI of the lumbar spine dated April 11, 2008, revealed mild degenerative changes at

26   L4-5 and L5-S1.  There were no definite features of disc herniation.  AR 442-43.

27   On May 27, 2008, Plaintiff saw Dr. Watrous and reported awakening with her hands

28   falling asleep.  She denied joint swelling, but complained of continued diffuse muscle tenderness.

1   On exam, she had mild tender points in the fibromyalgia sites, but no erythema in the peripheral

2   joints.  She also had mild tenderness in the paralumbar muscles.  AR 441.

3        On July 8, 2008, Plaintiff wanted to restart Bupropion and asked Dr. Cooper to complete

4   some forms for why she could not work.  Dr. Cooper suggested that she needed to "refer them to

5   the doctor that she sees most and who can say why she can't work."  AR 424.

6        On August 21, 2008, Plaintiff complained of ongoing numbness and tingling to the

7   fingers of both hands.  She was otherwise doing well.  On exam, she had full range of motion in

8   her neck and shoulders with no muscle spasm.  Tinel and Phalen signs were negative.  AR 440.

9        On October 29, 2008, Plaintiff saw Dr. Cooper, who noted that Plaintiff still had

10  difficulty with bringing in the groceries or lifting a laundry basket.  AR 423.

11       On November 7, 2008, Plaintiff reported ongoing numbness and tingling to her hands,

12  along with pain to her right leg and lower back.  On examination, she was in no acute discomfort,

13  she had full range of motion to her neck and upper extremities with no muscle wasting and her

14  gait was even and smooth.  AR 439.

15       Based on a nerve conduction study dated November 11, 2008, Dr. Watrous opined that a

16  neuropathy involving the right ulnar nerve should be considered.  AR 434-38.

17       On December 22, 2008, Dr. Watrous completed a Questionnaire form.  He opined that

18  Plaintiff's medical problems precluded her from performing any full-time work at any exertional

19  level.  Her primary impairments were fatigue and muscle pain based on criteria for a diagnosis of

20  fibromyalgia.  Dr. Watrous opined that Plaintiff could sit for less than one hour and stand/walk

21  20-30 minutes in an 8-hour work day.  She must lie down or elevate her legs for 15-20 minutes

22  during an 8-hour day.  Stress exacerbated her symptoms.  Dr. Watrous also believed that Plaintiff

23  had right ulnar neuropathy based on a nerve conduction study.  He opined that she could lift 5

24  pounds frequently and 10-15 pounds one time.  In an eight-hour work day, she could reach for

25  5% of the time, handle for 10%, feel for 30%, push/pull for less than 5% and grasp for less than

26  5%.  She could reach 1-2 minutes, handle 2-3 minutes, feel for 10 minutes, push/pull 2-3 minutes

27  and grasp 2-3 minutes at one time.  Dr. Watrous felt that Plaintiff had been disabled since May

28

27, 2008.  Dr. Watrous indicated that Plaintiff had pain on digital palpation in 16 of the 18 tender point sites for fibromyalgia.  AR 449-50.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity since April 28, 2005.  She had the severe impairments of degenerative disc disease of the lumbar spine, fibromyalgia, depression and anxiety.  Despite these impairments, the ALJ determined that Plaintiff retained a residual functional capacity ("RFC") to lift 20 pounds occasionally and 10 pounds frequently, could stand/walk for 2 hours out of 6 and sit for 6 hours out of an 8-hour workday.  She occasionally could climb, stoop or crawl, but was limited to simple, routine work.  With this RFC, Plaintiff could not perform her past relevant work, but could perform other jobs existing in the national economy.  AR 15-24.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  See Sanchez v. Sec'y of Health and Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

1

2                                    **REVIEW**

3          In order to qualify for benefits, a claimant must establish that she is unable to engage in

4   substantial gainful activity due to a medically determinable physical or mental impairment which

5   has lasted or can be expected to last for a continuous period of not less than 12 months.  42

6   U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of

7   such severity that she is not only unable to do her previous work, but cannot, considering her age,

8   education, and work experience, engage in any other kind of substantial gainful work which

9   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

10  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

11  Cir. 1990).

12         In an effort to achieve uniformity of decisions, the Commissioner has promulgated

13  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

14  C.F.R. §§ 404.1520 (a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1)

15  had not engaged in substantial gainful activity since her alleged onset date; (2) has an impairment

16  or a combination of impairments that is considered "severe" (degenerative disc disease of the

17  lumbar spine, fibromyalgia, depression and anxiety) based on the requirements in the Regulations

18  (20 C.F.R. § 404.1520(c)); (3) does not have an impairment or combination of impairments

19  which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations

20  No. 4; (4) she could not perform her past relevant work; but (5) could perform other jobs existing

21  in significant numbers in the national economy.  AR 17-24.

22         Here, Plaintiff contends that the ALJ erred by (1) improperly assessing her mental RFC;

23  (2) rejecting her treating physician's opinion; (3) rejecting her credibility; (4) failing to address

24  lay witness testimony; (5) failing to consider her obesity; and (6) providing an inadequate RFC.

25  ///

26  ///

27  ///

28   ///

**DISCUSSION**

A.   Mental Residual Functional Capacity

     Plaintiff first argues that the ALJ's mental RFC finding for simple, routine work was inconsistent with his finding of moderate difficulties in concentration, persistence, or pace.  AR 18, 19.  The Court disagrees.

     In *Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008), the claimant argued that the ALJ's RFC for simple, routine, repetitive work failed to capture a moderate limitation in the ability to perform at a consistent pace.  Even though the vocational expert testified that anything more than a mild limitation with respect to pace would preclude employment, the ALJ rejected this conclusion, in part, because it did not address the claimant's RFC.  In concluding that the ALJ's RFC properly incorporated the limitations regarding attention, concentration and adaptation, the Court explained:

> The ALJ translated Stubbs-Danielson's condition, including the pace and mental limitations, into the only concrete restrictions available to him-Dr. Eather's recommended restriction to "simple tasks."  This does not, as Stubbs-Danielson contends, constitute a rejection of Dr. McCollum's opinion.  Dr. Eather's assessment is consistent with Dr. McCollum's 2005 MRFCA, which found Stubbs-Danielson is "not significantly limited" in her ability to "carry out very short simple instructions," "maintain attention and concentration for extended periods," and "sustain an ordinary routine without special supervision."  As two of our sister circuits have recognized, an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony.  See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir.2001) (where state psychologist both identified claimant as having deficiencies of concentration, persistence or pace and pronounced claimant possessed the ability to "sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function," ALJ's hypothetical including ability to perform "simple, routine, repetitive tasks" adequately, captured claimant's deficiencies in concentration persistence or pace); Smith v. Halter, 307 F.3d 377, 379 (6th Cir.2001) (where ALJ's hypothetical incorporated concrete restrictions identified by examining psychiatrist regarding quotas, complexity, and stress, ALJ did not err in failing to include that claimant suffered from deficiencies in concentration, persistence, or pace).
>
> The Eighth Circuit's decision in *Howard* is directly on point.  There, the court explicitly rejected a claim that an ALJ's hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence, or pace.  The court noted the state psychologist's findings which concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks.  See Howard, 255 F.3d at 582.  The medical evidence by Dr. Eather in the present case reflects the same conclusion.

539 F.3d at 1174.

1   Based on this Circuit's precedent, the ALJ did not err by finding that Plaintiff was

2   capable of simple, routine work.  The ALJ's determination is supported by evidence

3   demonstrating that Plaintiff could perform simple, routine tasks despite any limitation in

4   concentration, persistence or pace.  For example, Dr. Hirokawa, the consultative examiner,

5   opined that Plaintiff only had "mildly limited" mental functional capacity and she could perform

6   simple three-step commands. AR 306-08.  The ALJ assigned Dr. Hirokawa's opinion

7   "significant weight" as it was consistent with the record.  AR 23.  A consultative examiner's

8   opinion serves as substantial evidence supporting an ALJ's findings.  *Tonapetyan v. Halter*, 242

9   *F.3d 1144, 1149 (9th Cir. 2001)*. Plaintiff has not challenged Dr. Hirokawa's findings.

10   Further, the ALJ noted that the state agency's opinion was consistent with Dr. Hirokawa's

11   opinion, with the exception of reducing work with the general public.[2]  In this instance, the state

12   agency physician indicated that Plaintiff only had mild difficulties in maintaining concentration,

13   persistence or pace and she was not significantly limited in sustained concentration or

14   persistence.  AR 309-319, 320-22.  As the state agency determination generally was consistent

15   with other evidence in the record, it also constitutes substantial evidence supporting the ALJ's

16   limitation to simple, routine work.  *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

17   B.   Medical Opinion of Dr. Watrous

18   Plaintiff contends that the ALJ committed reversible error when he failed to give valid

19   reasons for rejecting the opinion of her treating rheumatologist, Dr. Daniel Watrous.  It is true

20   that the opinions of treating doctors should be given more weight than the opinions of doctors

21   who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v.*

22   *Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted

23   by another doctor, it may be rejected only for "clear and convincing" reasons supported by

24   substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion

25   is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific

26   _____

27   [2]The ALJ discounted the state agency finding that Plaintiff had moderate limitations in her ability to interact appropriately with the general public, because Plaintiff testified that she did not have problems with co-workers and

28   had routinely dealt with the public.  AR 23, 320-22.  The ALJ also noted Plaintiff's clarification that she had been fired in response to her refusal to work at a drive through window at a fast food establishment.  AR 23.

1 and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v.*
2 *Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and
3 thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof,
4 and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must
5 do more than offer his conclusions.  He must set forth his own interpretations and explain why
6 they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th
7 Cir.1988).  Therefore, a treating physician's opinion must be given controlling weight if it is
8 well-supported and not inconsistent with the other substantial evidence in the record.
9 *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

10      Here, the ALJ set out a summary of the facts and conflicting clinical evidence.  In his
11 summary, the ALJ considered Dr. Watrous' opinion that Plaintiff was unable to perform any full-
12 time work at any exertional level.  AR 21.  However, the ALJ determined that the functional
13 limitations suggested by Dr. Watrous were inconsistent with the record.  AR 22.  The ALJ also
14 assigned little weight to Dr. Watrous' limitations because they exceeded Plaintiff's own admitted
15 activities of daily living.  AR 22.  An ALJ may consider that limitations assessed by a physician
16 are inconsistent with the claimant's level of daily activity in discrediting the opinion. *See Rollins*
17 *v. Massanari*, 261 F.3d 853, 856 (9th Cir.2001).

18      In finding that Plaintiff's reported activities were inconsistent with the marked limitations
19 set forth in Dr. Watrous' report, the ALJ first contrasted Plaintiff's testimony that she can only
20 walk for 5 minutes, with her testimony that she grocery shops with her husband, gets her three
21 children (ages 3, 9 and 11) ready for school, and takes her children to and from school.  AR 22.
22 Second, the ALJ referenced Plaintiff's allegations of functional limitations, but noted her ability
23 "to parent three children, one of them a toddler, with the assistance of her husband who works
24 '40 plus' hours per week."  AR 23.  Finally, the ALJ considered Plaintiff's daily activities as
25 reported to Dr. Hirokawa, which included cooking, vacuuming, laundry, sweeping and mopping,
26 and that her typical day entailed taking two of her children to school, caring for her younger child
27 at home, doing some light housework, picking up her children from school, cooking, cleaning up
28 and getting her children ready for an into bed.  She also reported that she enjoyed playing with

1   and reading to her children.  AR 23, 307.  The ALJ found that Plaintiff's report to Dr. Hirokawa

2   of her typical and active day was inconsistent with Dr. Watrous' assessment of her limitations.

3   AR 23.

4           Additionally, the ALJ assigned little weight to Dr. Watrous' limitations to the extent that

5   they were beyond those actually observed.  *Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir.

6   1992) (ALJ's observations during the hearing, along with other evidence, constitutes substantial

7   evidence).  Specifically, the ALJ pointed to Plaintiff's testimony that she could only sit for 5

8   minutes, which contrasted with her testimony that she watched television for 4 hours per day and,

9   "at the hearing, she was able to sit for 30 minutes and did not shift position until it was pointed

10  out to her that she had been sitting that long." AR 22.

11          In her reply, Plaintiff avers that the ALJ (and Commissioner) mischaracterized the

12  evidence.  According to the record, Plaintiff testified that she could sit up to five minutes without

13  pain.  AR 49.  When it was pointed out by her own attorney that she had been at the hearing for

14  longer than five minutes and she was still sitting, Plaintiff testified that she had to move around,

15  had "been moving around" and did not think she could "sit very much more longer right now."

16  AR 49.  Plaintiff asserts that she preserved the record of her hearing demeanor and the ALJ did

17  not appropriately note anything about her hearing demeanor that compromises her credibility.  At

18  a minimum, however, it is clear from the record that Plaintiff did not ask to stand or move

19  around prior to being questioned about her ability to sit.  An ALJ may consider ordinary

20  techniques of credibility evaluation, including testimony by a claimant that appears less than

21  candid.  *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

22          Regardless of whether the ALJ properly assessed Plaintiff's credibility based on his

23  observations, the ALJ properly rejected Dr. Watrous' limitations as inconsistent with the record.

24  For example, Dr. Watrous opined that Plaintiff could sit for less than one hour total in an 8-hour

25  day.  In contrast, Plaintiff testified that she drives her children to and from school, she sits and

26  reads with her three-year-old, and watches TV for about four hours per day.  AR 37, 44.  She

27  either has to get up and move around or "sit down."  AR 44. She also was able to sit for at least

28

thirty minutes at the hearing without interruption.  Thus, the ALJ's determination that Dr. Watrous' limitations were beyond those in the record was not error.

Where a treating physician's opinion is not given controlling weight due to substantial contradicting evidence in the record, the opinion still must be weighed using the factors set forth in 20 C.F.R. § 404.1527.  *See Lingenfelter*, 504 F.3d at 1038.  These factors include: the length and frequency of the treatment relationship, the nature and extent of the treatment relationship, the relevant evidence provided to support the medical opinion, the consistency of the opinion to the record as a whole, the physician's specialization, and other relevant factors. *See* 20 C.F.R. § 404.1527(d)(2)(i), (ii), (3), (4), (5) and (6).  In rejecting Dr. Watrous' assessment, the ALJ pointed to the opinion's inconsistency with the record and the lack of evidence supporting the opinion.  AR 22.  The ALJ also considered the nature and extent of the treatment relationship and the length and frequency of treatment.  In fact, the ALJ expressly noted that Dr. Watrous saw Plaintiff only "6 times between January 14, 2009 and [November] 7, 2008, approximately every 5-10 weeks."  AR 21.  As such, the ALJ took all of the required factors into account.

Plaintiff contends that the ALJ's analysis of Dr. Watrous' opinion "illustrates the ALJ's misunderstanding of fibromyalgia and his sheer disbelief that fibromyalgia can be disabling." Opening Brief, p. 13.  In support of this contention, Plaintiff cites the Ninth Circuit's decision in *Benecke v. Barnhart*, 379 F.3d 587 (9th Cir. 2004).  In *Benecke*, the court reasoned as follows:

> [T]he ALJ erred in discounting the opinions of Benecke's treating physicians, relying on his disbelief of Benecke's symptom testimony as well as his misunderstanding of fibromyalgia. The ALJ erred by "effectively requir[ing] 'objective' evidence for a disease that eludes such measurement." Green-*Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003) (reversing and remanding for an award of benefits where the claimant was disabled by fibromyalgia). Every rheumatologist who treated Benecke (Doctors Harris, Pace, and Gluck) diagnosed her with fibromyalgia.  Benecke consistently reported severe fibromyalgia symptoms both before and after diagnosis, and much of her medical record substantially pre-dates her disability application. Sheer disbelief is no substitute for substantial evidence.

*Id.* at 594.  The instant case is readily distinguishable from *Benecke* for a number of reasons. First, with the exception of Dr. Watrous, none of Plaintiff's prior treating physicians diagnosed her with fibromyalgia.  Second, Plaintiff did not consistently report severe fibromyalgia symptoms either before or after her diagnosis.  Indeed, prior to her diagnosis, Plaintiff's physical

1  complaints and treatment were directed primarily at her lower back and ankle pain, which

2  resulted from degenerative disc disease and ankle fractures.  The record is devoid of consistent

3  reports of "pain all over" or multiple tender spots, which are primary and distinguishing

4  symptoms of fibromyalgia.  *See, e.g., Rollins*, 261 F.3d at 855 (principal symptoms include pain

5  all over; distinguished from other rheumatic disorders by multiple tender spots).  Further,

6  Plaintiff was not diagnosed with fibromyalgia until *after* she told Dr. Cooper that she thought she

7  had fibromyalgia "based on review of internet."  AR 427.  At her initial evaluation with Dr.

8  Watrous, Plaintiff herself reported having fibromyalgia without the benefit of a physician's

9  diagnosis. AR 446.  Following her initial evaluation by Dr. Watrous, Plaintiff generally

10 exhibited only mild tenderness on examination. AR 441, 444.  In August 2008, she complained

11 of numbness and tingling in her fingers, but was otherwise doing well.  AR 440.  Where a

12 treating physician's conclusions about a claimant's functional limitations are not supported, the

13 ALJ may reject that opinion. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir.2003).

14        The Court recognizes that the ALJ found Dr. Watrous' limitations to be based primarily

15 on Plaintiff's subjective complaints.  Due to the subjective nature of a diagnosis of fibromyalgia,

16 the ALJ's assessment of Plaintiff's credibility is relevant to her doctor's diagnosis. *Fair v.

17 Bowen*, 885 F.2d 597, 605 (9th Cir. 1989).  As discussed below, however, the ALJ properly

18 discounted Plaintiff's credibility.

19        For these reasons, the ALJ's rejection of Dr. Watrous' opinion was supported by

20 substantial evidence and free of legal error.

21 C.     Plaintiff's Subjective Complaints

22        Plaintiff argues that the ALJ failed to provide sufficient reasons for rejecting her

23 testimony.  In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir.2007), the Ninth Circuit summarized

24 the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a

25 claimant's subjective complaints:

26              An ALJ is not "required to believe every allegation of disabling pain" or
              other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th
27            Cir.1989). However, to discredit a claimant's testimony when a medical
              impairment has been established, the ALJ must provide " 'specific, cogent reasons
28            for the disbelief.' " *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The

ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony ... An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see also Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

Here, the ALJ found Plaintiff's testimony was not credible for several reasons.  First, the ALJ noted Plaintiff's allegation that her disability onset date was April 28, 2005, but there was no medical record of her seeking medical attention for lumbar back pain until January 2006.  AR 23.  A claimant's failure to seek treatment is a proper basis for finding her allegations of disabling pain and other symptoms not credible. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001); *Fair*, 885 F.2d at 603 (failure to assert good reason for not seeking, or following prescribed course of, treatment can cast doubt on claimant's sincerity).

Plaintiff does not contradict the ALJ's determination.  Rather, she asserts that the ALJ commented on "missing records that he failed to obtain."  Opening Brief, p. 16.  Plaintiff's assertion insinuates that the ALJ did not adequately develop the record.  However, it is Plaintiff's burden to produce full and complete medical records, not the Commissioner's. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  Moreover, as the ALJ acknowledged, Plaintiff produced medical records from 2005, which identified back aches resulting from a urological infection that resolved.  AR 23.

Second, the ALJ noted Plaintiff's allegation that pain interfered with her ability to function "yet when referred to a specialized pain management program . . . in February 2006, she elected not to participate in the program until January 2007."  AR 23.  As previously discussed, an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an

adverse credibility finding unless one of a "number of good reasons for not doing so" applies. *Orn*, 495 F.3d at 638 (quoting *Fair*, 885 F.2d at 603). Here, Plaintiff faults the ALJ for failing to consider that she was unable to participate because she had no one to take care of her three children. Opening Brief, p. 15; AR 258. However, the ALJ's consideration of her participation was appropriate because during the relevant time frame Plaintiff received other medical care. She also was able to participate in the program in January 2007.

Third, the ALJ further discounted Plaintiff's allegations because she managed "to parent three children, one of them a toddler, with the assistance of her husband who works '40 plus' hours per week." AR 23. The Ninth Circuit has held that an ALJ may properly consider a plaintiff's "daily activities, such as attending to the needs of her . . . young children, cooking, housekeeping, laundry, shopping" as evidence that is inconsistent with a claim of disability. *See Rollins*, 261 F.3d at 857; *see also Bray v. Comm'r of Sec. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (noting claimant had active lifestyle, including cleaning, cooking, walking her dogs and driving to appointments). Thus, citation of Plaintiff's daily activities, including her efforts to care for her three children, constitutes a clear and convincing reason to challenge Plaintiff's credibility. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

For the reasons discussed above, the ALJ has provided specific, cogent reasons for discounting Plaintiff's credibility.

D.   Lay Witness Testimony

Plaintiff next asserts that the ALJ committed reversible error by failing to address lay witness testimony from her husband, Edward Teran.

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). The ALJ may discount lay witness testimony only if he gives "reasons that are germane to each witness." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir.2001) (Lay testimony is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness); *see also Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993).

Here, the ALJ erred by failing to expressly consider the third-party function report submitted by Mr. Teran in January 2007.  AR 165-72.  If an ALJ fails to expressly consider lay witness testimony, the court must determine whether the ALJ's decision remains legally valid, despite such error.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). If the ALJ's ultimate credibility determination and reasoning are adequately supported by substantial evidence in the record, no remand is required.  *Id.* (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195-97 (9th Cir.2004)).

In this case, Mr. Teran's function report essentially mirrored that of Plaintiff's own testimony.  Like Plaintiff, Mr. Teran reported that Plaintiff takes her two older children to school, takes care of her toddler, does light household cleaning, picks up her children from school, prepares small meals, and does light cleaning.[3]  Mr. Teran indicated that he helps Plaintiff when he gets home from work.  AR 165, 167.  He further explained that Plaintiff has fatigue, back pain and ankle pain.  Her impairments affect her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing, along with task completion, concentration and getting along with others.  AR 169-70.  With few exceptions, Plaintiff testified to all the same limitations noted by Mr. Teran and the ALJ considered these limitations in his opinion.  AR 19, 22, 23.  Mr. Teran's statement failed to add any additional information for the ALJ to consider.

The ALJ's failure to give express reasons for rejecting Mr. Teran's questionnaire was harmless error.  As discussed above, the ALJ rejected the testimony of Plaintiff and, by so doing, implicitly rejected Mr. Teran's testimony.  No reasonable ALJ would have reached a different decision based upon this evidence even if Mr. Teran's statement were fully credited.  *See Stout, 454 F.3d at 1056* ("[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reach a different disability determination").

///

---

[3]Mr. Teran also indicated that Plaintiff shops for food, clothes and toiletries in stores, by phone and by computer.  She can pay bills, count change, handle a savings account and use a checkbook/money orders.  AR 168.

E.    Obesity

Plaintiff contends that the ALJ erred by failing to consider her obesity.  As a general rule, an ALJ must determine the effect of a claimant's obesity upon her other impairments and ability to work. *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir.2003); *see also* SSR 02-01p (requiring an ALJ to consider the effects of obesity at several points in the five-step sequential evaluation). An ALJ must "evaluate each case based on the information in the case record," as obesity may or may not increase the severity or functional limitations of other impairments. SSR 02-01p.

Plaintiff specifically contends that the ALJ failed to explain whether her obesity caused or contributed to any of her alleged restrictions.  However, neither Plaintiff nor her attorney claimed that Plaintiff's obesity constituted a disabling impairment.  Plaintiff presented no evidence that her obesity limits her functioning or impairs her ability to work, whether alone or in combination with her other impairments.  Although the medical evidence noted her obesity and contained recommendations for weight loss, the treatment notes did not discuss any express limitations resulting from her obesity.  Moreover, in her briefing, Plaintiff has failed to point to any evidence of functional limitations due to obesity.  Given the lack of evidence, the ALJ's failure to address Plaintiff's obesity was not error.  *See Burch v. Barnhart,* 400 F.3d 676, 682 (9th Cir. 2005).

F.    RFC Finding and Vocational Expert Testimony

As a final matter, Plaintiff asserts that the VE's testimony has no evidentiary value because the ALJ's hypothetical question did not reflect either her mental limitations or the physical limitations identified by Dr. Watrous.

The hypothetical posed to the vocational expert must accurately reflect the claimant's physical and mental limitations that are determined credible and supported by the record. However, the ALJ may exclude restrictions in the hypothetical that are unsupported by the record or discredited as unreliable.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir.2001); *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir.1991); *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988).

As discussed above, the ALJ properly accounted for any mental limitations with his limitation to simple, routine work.  AR 19.  Further, the ALJ properly rejected the physical

limitations assessed by Dr. Watrous and thus he was not required to include these limitations in the hypothetical questions posed to the VE.  Accordingly, the ALJ did not err.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Jennifer Teran.

IT IS SO ORDERED.

**Dated:   February 3, 2011**                    _____ /s/ **Dennis L. Beck**_____
                                                              UNITED STATES MAGISTRATE JUDGE

29